UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| FABIOLA MARIA AVILES NORAT, | ) | Civil Action No.: 6:16-cv-00603-BHH |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| FLUOR INTERCONTINENTAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| JONATHAN MENENDEZ and CARLOS MEDINA MARTINEZ, | ) | Civil Action No.: 6:14-cv-04902-BHH |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | **OPINION AND ORDER** |
| FLUOR INTERCONTINENTAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on Defendant Fluor Intercontinental, Inc.'s ("Defendant" or "Fluor") renewed motion to dismiss Plaintiffs Fabiola Maria Aviles Norat, Jonathan Menendez, and Carlos Medina Martinez's (collectively "Plaintiffs," individually "Norat," "Menendez," and "Martinez") complaints for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (No. 6:16-cv-00603-BHH, ECF No. 50;

1

No. 6:14-cv-04902-BHH, ECF No. 70).[1] For the reasons set forth in this Order, Defendant's motion is denied.

<h2 style="text-align:center"><u>BACKGROUND</u></h2>

These cases arise out of a motor vehicle accident that occurred on March 1, 2013, at Bagram Airfield near Kabul, Afghanistan, when Plaintiffs Menendez and Martinez—at the time both Specialists on active duty in the U.S. Army—drove a Gator all-terrain vehicle ("Gator" or "ATV") into an uncovered excavation ditch and were injured (the "Accident"). At the time of the Accident, Defendant had an Electrical Support Services Contract ("ESS Contract" or "Contract") with the U.S. Army Corps of Engineers ("Army Corps" or "USACE"), under which Fluor was responsible for installing new electrical service distribution as well as renovating and maintaining existing electrical services at military installations for deployed U.S. Forces in the Central Command footprint, including the Afghan theater and Bagram. (*See* Ex. 1 to Dixon Decl., ECF No. 70-2 at 14.) Plaintiffs assert that Defendant ignored certain legal and contractual obligations owed to Plaintiffs by failing to take appropriate measures to prevent such an accident from occurring.[2] Plaintiffs aver that Fluor was negligent in removing steel plates that covered the excavation pit into which they drove, and in failing to provide lights, wooden or concrete barricades, warning signs, or other precautionary indications that the excavation pit was uncovered. Defendant contends that the Army Corps directed and controlled Defendant's performance under the Contract, that Defendant complied with all pertinent safety requirements, and that Defendant fulfilled its legal and

---

[1] For ease of reference, the Court will hereinafter provide citations to the docket numbers associated with ECF No. 70 in action No. 6:14-cv-04902-BHH, which is identical to the corollary filing in the companion case.

[2] Plaintiff Norat's complaint asserts a loss of consortium claim for injuries suffered by her husband, Plaintiff Martinez, arising from the Accident.

contractual obligations to the USACE.

The Court denied Defendant's initial motion to dismiss without prejudice and with leave to re-file once jurisdictional discovery had been completed. (*See* ECF No. 25.) The goal of the jurisdictional discovery was to establish a sufficient factual basis on which to make determinations whether the political question doctrine, preemption, or derivative sovereign immunity bar Plaintiffs' claims. Upon completion of the jurisdictional discovery, Defendant filed the instant renewed motion to dismiss on March 15, 2017. (ECF No. 70.) Plaintiffs responded on March 29, 2017 (ECF No. 75), and Defendant replied on April 5, 2017 (ECF No. 76). On March 6, 2018, after obtaining leave of Court, Plaintiffs filed an amended memorandum in opposition to Defendant's motion, updating their presentation of the relevant facts based upon Fluor's responses to their requests for admissions. (*See* ECF No. 84.) The matter is ripe for consideration.

## STANDARD OF REVIEW

"When a Rule 12(b)(1) motion challenge is raised to the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff." *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). In deciding such a motion, "'the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014) (quoting *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004)). "However, 'when the jurisdictional facts are inextricably intertwined with those central to the merits, the [district] court should resolve the relevant factual disputes only after appropriate

discovery.'" *Id.* at 334 (quoting *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009)). When determining whether subject matter jurisdiction is present, the court applies the standard applicable to motions for summary judgment where the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. *Richmond*, 945 F.2d at 768 (citing *Trentacosta v. Frontier Pacific Aircraft Indus.*, 813 F.2d 1553, 1559 (9th Cir. 1987)). "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556)). In considering a motion to dismiss under Rule 12(b)(6), a court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff . . . ." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). However, a court "'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir.2006)) (modification in original). A court should grant a Rule 12(b)(6) motion if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from

those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

## DISCUSSION

Defendant moves to dismiss Plaintiffs' complaints on the following grounds: (1) Plaintiffs' claims are non-justiciable under the political question doctrine; (2) Plaintiffs' tort claims are preempted by the "combatant activities exception" to the federal government's waiver of immunity in the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(j); (3) Plaintiffs cannot state a claim against Defendant because Fluor is entitled to derivative sovereign immunity based on the "discretionary function exception" to the FTCA, 28 U.S.C. § 2680(a). As set forth below, the undersigned finds that none of these bases require dismissal under the factual context currently before the Court.

### A. Applicability of the Political Question Doctrine

"The political question doctrine had its genesis in the Supreme Court's decision of *Marbury v. Madison*, where Chief Justice Marshall explained that '[q]uestions, in their nature political, of which are, by the constitution and laws, submitted to the executive, can never be made in this court.'" *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 408 (4th Cir. 2011) (quoting *Marbury v. Madison*, 5 U.S. 137 (1803)). "Pursuant to the political question doctrine, the judiciary is deprived of jurisdiction to assess decisions exclusively committed to a separate branch of government. For example, most military decisions lie solely within the purview of the executive branch." *Id.* at 407 n.9 (citing *Baker v. Carr*, 369 U.S. 186 (1962)). However, the fact that a government contractor "was acting under orders of the military does not, in and of itself, insulate the claim from

judicial review." *Id.* at 411. "Therefore, although cases involving military decision making often fall in the political question box, we cannot categorize such a case as nonjusticiable without delving into the circumstances at issue." *Burn Pit*, 744 F.3d at 334.

The U.S. Supreme Court, in *Baker v. Carr*, set forth a test establishing six factors a court should consider when deciding whether a case presents a political question, including whether the case evinces:

> (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department," (2) "a lack of judicially discoverable and manageable standards for resolving" the issue, (3) "the impossibility of deciding [the issue] without an initial policy determination of a kind clearly for nonjudicial discretion," (4) "the impossibility of a court's undertaking independent resolution [of the issue] without expressing lack of the respect due coordinate branches of government," (5) an "unusual need for unquestioning adherence to a political decision already made," or (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

*Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)) (modifications in original). In cases involving the civil liability of military contractors for alleged negligence, the Fourth Circuit Court of Appeals has distilled the *Baker* factors into two questions for determining whether a court has subject matter jurisdiction:

> [F]irst . . . "whether the government contractor was under the 'plenary' or 'direct' control of the military" (direct control). Second, . . . whether "national defense interests were 'closely intertwined' with military decisions governing the contractor's conduct, such that a decision on the merits of the claim 'would require the judiciary to question actual, sensitive judgments made by the military.'" An affirmative response to either of the two [questions], namely, the fact of direct control or the need to question sensitive military judgments, generally triggers application of the political question doctrine.

*Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 155 (4th Cir. 2016) (quoting *Taylor*, 658 F.3d at 411) (internal citations omitted). This test has been applied by the

Fourth Circuit numerous times beginning with *Taylor v. Kellogg Brown & Root Servs., Inc.*, and the two questions posed above have come to be known as the "*Taylor* factors."

In *Taylor*, the Fourth Circuit determined that the political question doctrine barred a U.S. Marine's negligence suit against military contractor, KBR. The Marine—Peter Taylor—was electrocuted and suffered severe injuries when a KBR employee turned on the power to an electric generator at Camp Fallujah, Iraq, after having been specifically instructed by Marine Corps personnel not to do so. 658 F.3d at 404. The generator powered Camp Fallujah's tank ramp and had malfunctioned. There had been several such power outages, and a group of Marines, including Taylor, decided to install a wiring box at the tank ramp and hook up their own generator. As such, the main generator had been turned off. Taylor was working on the wiring box when the generator was turned on, resulting in his injuries. Importantly, jurisdictional discovery in the case established that the use of secondary or backup generator sources to power individual Camp facilities, such as the truck ramp, in the event of primary power failure had to be authorized by the "Mayor's Cell," commanded by Marine Major Omar Randall, and the truck ramp had not been authorized for backup power. *Id.* at 406.

The *Taylor* court disagreed with underlying district court opinion and found that the direct control factor did not implicate the political question doctrine under the facts of the case because the explicit terms of the contract made KBR responsible for the physical safety of workers and servicemembers that might come into contact with the hazards presented by is electrical work. Specifically, the court quoted a section of the contract entitled "Statement of Work," which provided: "[KBR] shall be responsible for

safety of employees and base camp residents during all [KBR] operations conducted in accordance with this Statement of Work and [applicable Army safety regulations]." 658 F.3d at 406. Accordingly, the court found that where KBR was "solely responsible for the safety of all 'camp residents during all contractor operations,'" KBR could not be deemed to be under the plenary control of the military. *Id.* at 411 (quoting the underlying contract). In so finding, the *Taylor* court distinguished the factual scenario from the situation at issue in *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, where the Eleventh Circuit held that military authorities exercised plenary control over KBR's involvement in convoy operations. 572 F.3d 1271, 1276-77 (11th Cir. 2009) (holding the direct control factor counseled toward nonjusticiability in a suit for damages arising from a convoy crash because "it is the military, not civilian contractors, that decides when convoys are to be arranged, the routes to be traveled, the amount of fuel or other supplies to transported, the speed at which the vehicles are to travel, the number of vehicles to be included in the convoy, the spacing to be maintained between vehicles, and the security measures to be employed, and other details of the mission").

Nonetheless, the *Taylor* court held that the district court correctly concluded that Taylor's negligence claims were nonjusticiable under the political question doctrine by application of the "sensitive military judgments" factor. Specifically, the Fourth Circuit held that an analysis of KBR's contributory negligence defense would require the judiciary to question "actual, sensitive judgments made by the military," including whether Taylor and other Marines made a reasonable decision in seeking to install the wiring box to add another electric generator at the tank ramp, and "especially" the issue of the Mayor's Cell decision not to provide a backup generator for the tank ramp in the

first place. *Id.* at 411-12. Thus, the *Taylor* court found the case nonjusticiable based on the second factor alone. *See Burn Pit*, 744 F.3d at 335 (noting the *Taylor* court's sole reliance on the sensitive military judgments factor in making a nonjusticiability finding).

In *In re KBR, Inc., Burn Pit Litigation*, the Fourth Circuit vacated the district court's decision to dismiss military servicemembers' tort claims (including negligence) based upon their putative nonjusticiability under the political question doctrine. 744 F.3d 326, 341. The *Burn Pit* court held that neither the first nor the second *Taylor* factor indicated that the servicemembers' claims were nonjusticiable when considered in light of the factual context before the court. *Id.* The Judicial Panel on Multidistrict Litigation had consolidated fifty-eight separate complaints—the majority prosecuted by U.S. military personnel—alleging various tort and contract claims stemming from injuries suffered by servicemembers as a result of KBR's waste disposal and water treatment practices. *Id.* at 332. KBR moved to dismiss the servicemembers claims pursuant to, *inter alia*, the political question doctrine; the district court granted KBR's motion holding that both *Taylor* factors counseled toward nonjusticiability of the servicemembers' claims. *Id.* at 333. The Fourth Circuit noted that although some evidence demonstrated that the military exercised control over KBR's burn pit activities—e.g., a letter from General David Petraeus stating the need for burn pits during contingency operations, and declarations from various military officials and civilians indicating that the military decided what method of waste disposal to use on bases in Iraq and Afghanistan—other evidence presented by the servicemembers contradicted this picture—e.g., a U.S. Army manual indicating that the military does not tell logistics contractors how to perform the mission but only what the end result must be, and declarations from KBR managers

stating that KBR was exclusively responsible for operating the burn pits in performance of the relevant contract. *Id.* at 336-37. The Fourth Circuit also determined that the military exercised some degree of oversight regarding KBR's water treatment functions, though the relevant task orders delegated potable and non-potable water production, distribution, and disposal to KBR. *Id.* at 337-38. The *Burn Pit* court concluded that the military's control over KBR's burn pit and water treatment tasks did not appear to arise to the level of control over convoy operations present in *Carmichael*, and likened the *Burn Pit* case to *Harris v. Kellogg Brown & Root Services, Inc.*, in which the Third Circuit stated, "where the military does not exercise control but merely provides the contractor with *general guidelines* that can be satisfied at the contractor's discretion, contractor actions taken within that discretion do not necessarily implicate unreviewable military decisions." 724 F.3d 458, 467 (emphasis added). Ultimately, the *Burn Pit* court stated that it could not "determine whether the military control factor renders [the] case nonjusticiable at this time" because "we simply need more evidence to determine whether KBR or the military chose *how* to carry out [burn pit and water treatment operations]." 744 F.3d at 339 (emphasis added).

Respecting the second *Taylor* factor, the *Burn Pit* court concluded that KBR's "proximate causation" defense would not necessarily require the district court to evaluate the propriety of military judgments. *Id.* at 340. KBR's defense boiled down to its assertion that the servicemembers' "alleged injuries were caused by military decisions and conduct, not by KBR." *Id.* The Fourth Circuit distinguished this defense from the contributory negligence defense at issue in *Taylor*, the resolution of which would have "invariably require[d] the Court to decide whether . . . the [military] made a *reasonable*

decision." *See Taylor*, 658 F.3d at 411 (emphasis added). In contrast, KBR's proximate causation defense would simply require the district court "to decide if the military made decisions regarding (1) whether to use, how to use, and where to locate burn pits and (2) how to conduct water treatment," without extending to the *reasonableness* of those decisions. 744 F.3d at 340. Again, the Fourth Circuit likened the *Burn Pit* case to the decision in *Harris*, where the Third Circuit held that a contractor's proximate causation defense—asserted against a claim that the contractor negligently performed maintenance duties thereby causing a soldier's death—would require evaluation of strategic military decisions *only if* the governing law used a proportional-liability system that assigned liability based on fault. *Id.* Accordingly, KBR's proximate causation defense in *Burn Pit* would not require a court to evaluate military decision making unless (1) the military caused the plaintiffs' injuries, at least in part, and (2) the plaintiffs invoked a proportional-liability system that allocated liability based on fault. *Id.* at 340-41. The *Burn Pit* court deemed this potentiality too remote to find that the second *Taylor* factor weighed toward nonjusticiability and remanded the case for further proceedings.

In *Al Shimari v. CACI Premier Tech., Inc.*, four Iraqi nationals alleged that they were abused while detained in the custody of the U.S. Army at Abu Ghraib prison, and alleged various tort claims against the military contractor, CACI, that participated in interrogation operations, including assault and battery, sexual assault and battery, and intentional infliction of emotional distress. 840 F.3d 147, 151 (4th Cir. 2016). The case came before the Fourth Circuit for the fourth time after limited jurisdictional discovery and a finding by the district court that the plaintiffs' claims were nonjusticiable under the political question doctrine. The Fourth Circuit vacated the district court's judgment and

remanded for reexamination of subject matter jurisdiction in light of two holdings: (1) "conduct by CACI employees that was unlawful when committed is justiciable, irrespective whether that conduct occurred under the actual control of the military," and (2) "acts committed by CACI employees are shielded from judicial review under the political question doctrine if they were not unlawful when committed and occurred under the actual control of the military or involved sensitive military judgments." *Id.*

With regard to the first *Taylor* factor, the *Al Shimari* court found that the evidence regarding the military's control over CACI interrogators demonstrated both the presence of *formal* control—e.g., the military functioned as the official command structure at Abu Ghraib and instituted formal procedures to govern the interrogation process, including the submission of interrogation plans to the military chain of command for advance approval—and a lack of *actual* control over contractor interrogators—e.g., the military leaders at Abu Ghraib failed to properly supervise subordinates or provide direct oversight of the mission, and failed to demonstrate an adequate command presence, which resulted in a "command vacuum." *Id.* at 156-57. The court stated:

> The first Taylor factor is not satisfied by merely examining the directives issued by the military for conducting interrogation sessions, or by reviewing any particular interrogation plans that the military command approved in advance. Instead, *the concept of direct control encompasses not only the requirements that were set in place in advance of the interrogations, but also what actually occurred in practice* during those interrogations and related activities.

*Id.* at 157 (emphasis added). In vacating the lower court's finding of nonjusticiability, the Fourth Circuit noted that the district court "began and ended its analysis by drawing conclusions based on the evidence of *formal* control" without ever truly "addressing the issue of *actual* control." *Id.* (emphasis added).

Regarding the second *Taylor* factor, the Fourth Circuit concluded that the district court's analysis was incomplete when it "explained that it was unequipped to evaluate whether the use of certain 'extreme interrogation measures in the theatre of war' was appropriate or justified." *Id.* at 158. The *Al Shimari* court found that the district court erred by "failing to draw a distinction between unlawful conduct and discretionary acts that were not unlawful when committed." *Id.* Accordingly, "to the extent that the plaintiffs' claims rest[ed] on allegations of unlawful conduct in violation of settled international law or criminal law . . . those claims [fell] outside the protection of the political question doctrine." *Id.* On remand, the Fourth Circuit directed the district court to segregate such justiciable claims before proceeding to determine whether CACI's other, not-unlawful conduct implicated qualitative assessment of sensitive military judgments under *Taylor*'s second prong. *Id.*

The *Al Shimari* court stated, "[W]e hold that any conduct of the CACI employees that occurred under the *actual* control of the military or involved sensitive military judgments, and was not unlawful when committed, constituted a protected exercise of discretion under the political question doctrine." *Id.* at 159 (emphasis added). Moreover, the court cautioned that the distinction between justiciable claims that clearly alleged unlawful conduct (e.g., sexual assault) and "grey area" conduct that was committed under the actual control of the military or involved sensitive military judgments and was therefore nonjusticiable (e.g., "enhanced interrogation tactics" the lawfulness of which was not settled at the time they occurred), would involve a "'discriminating analysis,'" and would "require the district court to examine the evidence *regarding the specific conduct to which the plaintiffs were subjected* and *the source of any direction under*

which the acts took place." *Id.* at 160 (quoting *Baker*, 369 U.S. at 211) (emphasis added). Finally, the court instructed that, "If disputed facts are 'inextricably intertwined' with the facts underlying the merits of the plaintiffs' claims, the district court should resolve these disputed jurisdictional facts *along with the intertwined merits issues.*" *Id.* at 160-61 (citing *Kerns*, 585 F.3d at 193).

This Court has distilled the following lessons from the Fourth Circuit's holdings regarding the justiciability *vel non* of military contractors' civil liability for conduct performed in conjunction with in-theatre military operations: (1) the type of "direct control" that implicates nonjusticiability results from the military's *actual* control over the specific acts or omissions that form the basis of the plaintiff's claim, and it is not invoked by mere *formal* control or general oversight by military authorities respecting the contractor's activities (*see Taylor*, 658 F.3d at 411; *Burn Pit*, 744 F.3d at 337-39; *Al Shamiri*, 840 F.3d at 156-57); (2) the type of questioning, by courts, of "sensitive military judgments" that the political question doctrine abjures is that analysis which purports to assess the *reasonableness* or prudence of specific military decisions, and nonjusticiability is not implicated by the mere fact of military personnel's general involvement with integrated contractor operations (*see Taylor*, 658 F.3d at 411-12; *Burn Pit*, 744 F.3d at 340-41; *Al Shamiri*, 840 F.3d at 158-60; *see also Baker*, 369 U.S. at 217 (delineating, in factors three and four, policy determinations of a kind clearly for nonjudicial discretion and the necessity for the judiciary's respect of coordinate branches' decisions as reasons for invocation of the political question doctrine)). With these principles in mind, the Court finds that it possesses subject matter jurisdiction

over the instant claims because neither the first nor the second *Taylor* factor counsels toward nonjusticiability of those claims under the facts currently in the record.

### 1. Whether Fluor Was Under Direct Military Control

In the motion to dismiss, Defendant relies upon three sources in the attempt to show that the Army Corps exercised direct control over Fluor: (1) the ESS Contract and applicable Task Orders, (2) quality assurance reports prepared by the Army Corps' construction representative, Walter Diefendorf ("Diefendorf"), and (3) deposition testimony from Diefendorf and Army Corps civil engineer, Richard Sanchez, regarding the process for amending the Contract and efforts at monitoring the safety of the worksite. (*See* ECF No. 70-1 at 10-19.) While the evidence shows general USACE oversight of Fluor's installation of new electrical service distribution at Bagram, it simultaneously reveals that such oversight did not arise to the level of plenary control envisioned by the first *Taylor* factor and did not extend to *actual* control over the safety precautions employed by Fluor at its worksites.

Relevant provisions of the Contract subordinate certain parameters of Fluor's performance to the discretion of the Army Corps' "COR/COTR" (Contracting Officer Representative/Technical Representative). In this case, the COR was Mr. Diefendorf. Specifically, the Contract indicates that the COR has discretion to alter the contractor's otherwise mandatory working hours and ensure compliance with the specifications and plans as approved in the "Quality Control Plan." (*See* Ex. 1 to Dixon Decl., ECF No. 70-2 at 15 (paragraphs 1.10 Work Period and 1.12 Supervision and Quality Control).) Moreover, Fluor's work at Bagram was implemented through two "Task Orders" issued by the USACE, appended to the ESS Contract, and performed simultaneously due to

the nature of the electrical work. (*See id.* at 39-109.) The Task Orders provide a general outline of the work to be done, including that Fluor "shall provide Design and Installation of electrical distribution system to meet the future electrical demand of Bagram's Eastern Expansion area." (*Id.* at 103 (Task Order No. 5 – Section I-Summary of Work).) Further, the Task Orders require the work to be done "at designated locations," state that Fluor "shall not begin work until receiving written approval on the final design from the COTR," and mandate that "[a]ny deviations from the approved design must receive written approval from the COTR prior to implementation." (*Id.* at 103-04.) Finally, the Task Orders set forth various project specifications, facility location instructions, and technical requirements applicable to the installation. (*See id.* at 41-46 (Task Order No. 8 – Statement of Work-Project Description & General Requirements); 103-108 (Task Order No. 5 – Option 0001-0005, Section II-Technical Requirements).)

However, similar to the contract at issue in *Taylor*, the Task Orders in the instant case made Fluor responsible for establishing and maintaining the safety of appurtenant worksites:

> **5. Safety Requirements**
> The contractor shall provide a written Safety Plan and Activity Hazard Analysis that addresses each phase of this [Statement of Work]. The Contractor shall provide all safety equipment in accordance with OSHA standards to include personnel reflective gear for use at staging areas and installation sites during periods of limited visibility. The Contractor shall designate a supervisory person to be present on the site, overseeing work at the site. The person may have additional duties as crew foreman. The Contractor shall comply with all requirements of the [applicable USACE Safety Manual].
>
> **6. Safety Perimeter**
> The Contractor shall establish a safety zone around the work area and establish a safety system with warning markers and other devices to prevent injuries to pedestrians and others who may be on or near the site. The Contractor shall assume any liability for any injury incurred by

> Contractor personnel while working on site. If there are areas that have land mines near the construction site, the Contractor is responsible to ensure that his personnel obey posted signs and do not wander into mine fields. FAILURE TO FOLLOW SAFETY REGULATIONS MAY RESULT IN THE CONTRACTOR BEING ORDERED TO STOP WORK OR TERMINATION OF THE CONTRACT.

(*Id.* a 47.) Moreover, read as a whole, the ESS Contract shifts all material aspects of the construction process to Fluor's control in designing, building, and providing a "turnkey" product (*see id.* at 51 (21. Task Order Proposal)), and in so doing assigns related safety management responsibilities to Fluor:

> 1.5 SAFETY REQUIREMENTS: The contractor shall ensure that employees are supplied with and use proper safety equipment (i.e. gloves, safety glasses, and boots) and follow work procedures in accordance with approved Safety Plan, which protect both contractor employees and *U.S. soldiers in proximity to the job site. The Contractor shall establish a safety zone around the work area and establish a safety system to prevent worker injuries.* Contractor shall direct all safety related questions to the COTR.
> . . . .
>
> 1.7. WORKING CONDITIONS: The Contractor is *responsible for inspecting all areas and determining actual work area conditions and work requirements.* Existing conditions shall not be the basis for any modifications to the contract.

(*Id.* at 13 (Section 1: General Requirements).) Pursuant to its duties under the Contract, Fluor generated a traffic safety plan with detailed provisions regarding the precautionary measures it would employ during the installation of new electric distribution at Bagram. (*See* Traffic Control Plan, ECF No. 75-3 at 1-12.)

Though the Contract and the Task Orders detailed certain Army Corps specifications that Fluor must meet and approval requirements that must be satisfied, ultimately Fluor and not the Army Corps dictated the means and methods by which contract performance was to be achieved. Walter Diefendorf, the Army Corps'

construction representative over Fluor's contracts in Afghanistan confirmed as much in his deposition testimony describing the Contract as a "design build":

> [T]he contractor is selected through a – a vetting process, and typically – I can't say all, but most all the contracts now are what's called design build. We hire a company, we want this project, here's all the – the pages and pages of what it needs to be. *You go get a designer to tell you how it needs to be put in place and you do the work. Design build.*
>
> \*\*\*
>
> The Corps of Engineers hires a contractor to design and then to install or construct whatever the project requirements are. *The designer and the contractor are responsible for means and methods. So at no time would the Corps of Engineers say don't do it that way, do it this way, because that puts the liability on me and on the Corps of Engineers.* Here, again, it's – it's up to the subcontractor for means and methods. And I was operating just as a – a pair of eyes and a pair of ears on the site for the government.

(Diefendorf Dep. 39:1-11, 71:6-16, ECF No. 75-8 at 6, 12 (emphasis added).)[3] The picture that emerges from the relationship between the Army Corps and Fluor in the context of the ESS Contract is one of *formal* control, but not *actual* control. *See Al Shamari*, 840 F.3d at 157 (holding that the first *Taylor* factor is not satisfied by citing general directives issued by the military regarding contractor performance, or even by reviewing particular plans approved in advance the military command, but by examining "what actually occurred in practice" during the activities in question). The evidence does not show that Mr. Diefendorf was acting as a *de facto* foreman over Fluor's construction sites, but rather that his job was to ensure that the government got what it paid for and that the work was being done in accordance with USACE specifications and

---

[3] Mr. Diefendorf's supervisor, Richard Sanchez, the Army Corps' civil engineer over Fluor's contracts in Afghanistan, confirmed this characterization of a design build: "In design-build, the government doesn't necessarily approve [what is submitted by contractor]. They provide, this conforms to the specifications, because as soon as somebody approves something, you've taken the liability on your shoulders. And if it's a design-build, the contractor is taking the liability, saying, I'm going to provide the design and I'm going to complete the whole thing and it will work. So that's the difference." (Sanchez Dep. 32:9-16, ECF No. 75-7 at 6.)

preapproved design. (*See* Diefendorf Dep. 23:10-13, 72:4-6, ECF No. 75-8 at 5, 13.)[4] The notion that Diefendorf, as the military's representative, exercised direct control over Fluor's conduct in the way that first *Taylor* factor envisions is belied by the fact that he did not even learn of the Accident on Fluor's construction site until several weeks after it occurred. (*See id.* 14:6-8.) On the current record, the Army Corps' oversight of Fluor's construction operations, as set forth in the ESS Contract and Task Orders, comes nowhere near the level of plenary military control over contractor conduct present in *Carmichael*, and Fourth Circuit precedent dictates that the first *Taylor* factor does not counsel toward nonjusticiability under the circumstances. *See Taylor*, 658 F.3d at 411; s*ee also Burn Pit*, 744 F.3d at 339; *Al Shamiri*, 840 F.3d at 157.

Furthermore, the quality assurance reports prepared by Mr. Diefendorf and deposition testimony regarding contract amendment and safety monitoring at the worksite do not substantiate direct military control over Fluor sufficient to prescribe nonjusticiability under the first *Taylor* factor. It is true that Mr. Diefendorf's daily reports show that he was in fairly regular contact with Fluor personnel at the worksite and pointed out compliance failures when he observed them. (*See, e.g.*, 01 Mar 2013 QAR,[5]

---

[4] Mr. Sanchez also specifically disclaimed directing Fluor's work, stating: "Basically, I don't direct anything. I coordinate." (Sanchez Dep. 9:3-4); "Again, I will say I do not direct, okay. If you read the [Army Federal Acquisition Regulation] and you read the guidelines, it's – you supervise a project according to the protocol and the contract. And so I don't direct anything." (Sanchez Dep. 9:17-20); "Again I will say it, and I will keep saying it. I do not direct anybody. I did not direct anybody. The process of modification goes through the process of an RFI." (Sanchez Dep. 21:25-22:3); "My job was to oversee a number of project engineers and QAs and make sure that the contract was adhered to and that all the requirements, such as reporting, safety, all these things, were fulfilled every day, basically." (Sanchez Dep. 13:6-10). (ECF No. 75-7 at 2-4.)
[5] The March 1, 2013 Quality Assurance Report, under "Verbal Instructions Given to Contractor," states: "Discussed the incorrectly piled soil too near the edge of the excavation. Told KTR [Contractor] Safety the reason for the 60cm spacing between the excavation and the toe of the pile." Under "Results of Safety Inspection" it states, *inter alia*: "The Excavation which has filled with water has a side which [sic] a crack in the soil has appeared. Told safety man the side needs corrected in order to be safe, before anyone is allowed into the excavation to work. He stated they intend to enlarge the excavation in order to comply with OSHA and EM 385-1-1."

ECF No. 70-6 at 6; 03 Mar 2013 QAR,[6] ECF No. 70-6 at 7.) However, thirteen of the sixteen reports relied upon by Defendant as evidence of the military's direct control over Fluor postdate the Accident. (*See* ECF No. 70-1 at 14-16.) Moreover, routine inspections by the Army Corps' representative entrusted with ensuring Fluor's compliance with contractual specifications do not, in themselves, indicate *actual* control over Fluor's construction activities. It is worth noting that Diefendorf's reports consistently refer to the "Site Superintendent" and Fluor's "Safety Man," to whom he communicated compliance related issues, and who were apparently expected to correct subordinate conduct and remedy construction irregularities. (*See generally* ECF No. 70-6 at 2-21.) This confirms Fluor's control, through its own managerial personnel, over the "means and methods" of executing the contract.

Similarly, the deposition testimony regarding contract amendment and safety monitoring at the worksite reveals general oversight by the military over Fluor's activities, but not of a kind or degree sufficient to trigger *Taylor*'s direct control factor. Mr. Sanchez, an Army Corps civil engineer who simultaneously oversaw multiple "CORs" or "QAs"[7] including Mr. Diefendorf, testified that when unanticipated issues necessitated modification of a contract the contractor was required to submit a Request for Information ("RFI") to the Army Corps for approval before altering their course of

---

[6] The March 3, 2013 Quality Assurance Report, under "Results of Safety Inspection," states: "Found the situation where the excavator operator has piled excess soil adjacent to the excavations. Although the weight of this soil is not considered critical to the shallow excavation, it does hinder safe access along the side of the trench. Told Safety man this should always be placed at least 60cm (2') from the edge of the trench. Also explained about the weight surcharging the excavation wall, in the event the excavation is deeper than 1.2M (4'). Workers were observed to be wearing all required PPE for work activities in progress."
[7] The Army Corps seems to have used the terms "COR" and "QA" synonymously, or at least to have envisioned a particular individual serving in both roles interchangeably. (*See* Diefendorf Dep. 23:5-9, ECF No. 75-8 at 23 ("[I]t's unclear to me . . . why the government defined it one way or the other because I was doing . . . exactly the same thing [as COR on the Fluor project] as when I was a QAR in other locations.").)

performance. (Sanchez Dep. 10:21-11:8, ECF No. 75-7 at 2.) Mr. Sanchez would then coordinate with the contracting officer and area engineer, along with representatives of the Army, Air Force, or whichever military branch was affected, and obtain recommendations for how to modify the contract in response to the RFI. (*Id.* 11:11-23.) Mr. Diefendorf testified that unanticipated issues arose frequently and that execution of construction plans was like a "moving target," sometimes requiring the contract to be amended, altered, or adjusted, and sometimes allowing for necessary adjustments without formally amending the contract. (*See* Diefendorf Dep. 17:17-18:6, ECF No. 70-4 at 18-19.) However, this kind of routine query and approval process still falls within the type of general oversight that indicates *some* military control over Fluor, but not the *complete* control that would implicate *Taylor*'s first factor. *See Burn Pit*, 744 F.3d at 336-38 (finding, where evidence of discretionary control over contractor operations pointed in both directions, that the direct control factor did not trigger nonjusticiability). There is no indication that design and installation responsibilities passed from Fluor to military personnel in the event that the ESS Contract required modification. Rather, the RFI and amendment approval process were envisioned in the Contract from the outset, and constituted a natural outworking of the contractual relationship between Fluor and the Army Corps already described. Additionally, the Fourth Circuit considered the issue of government approval of modifications to contractor performance in *Al Shamiri*, finding that the mere requirement of military approval did not, in itself, constitute actual control for purposes of deeming a claim nonjusticiable under *Taylor* factor one. 840 F.3d at 156 ("[A]ll interrogators were required to submit interrogation plans to the military chain of command for advance approval. These plans specified the interrogation methods that

the particular interrogators intended to employ and *included requests for separate approval of more aggressive tactics, if necessary.*" (emphasis added)).

Mr. Diefendorf testified that part of his job as COR or quality assurance representative was to ensure, on the Army Corps' behalf, that safety requirements were being followed for the sake of both the government and the contractor employees themselves. (Diefendorf Dep. 23:14-17, 55:19-56:3, ECF No. 70-4 at 24, 56-57.) He stated that he could not recall having any specific problems with Fluor as to the safety requirements of the worksite in question, but that there were surely minor infractions. (*Id.* 26:12-27:7.) He also remembered conversations with Fluor's safety officer, unrelated to the Accident, in which he had told the safety officer, "safety is your only job and if you won't do it we'll have you removed, the Corps will have you removed. So he understood that . . . when I said it had to be done I wasn't asking him." (*Id.*) But again, this type of inspection, critique, and compliance evaluation does not arise to plenary control. Indeed, Mr. Diefendorf did not even follow up with Fluor when he found out about the Accident by reading the military policy report weeks later: "I viewed this as an issue between Fluor and the MPs. I mean, it was the MP report. I didn't witness it. I had no knowledge of it. It's not in my arena." (*Id.* 29:1-4.)

In summary, the evidence cited by Defendant is insufficient to establish the type and degree of control that implicates nonjusticiability under *Taylor*'s first factor. The Army Corp's general oversight of Fluor's performance is akin to instances of *formal* control that the Fourth Circuit has repeatedly found insufficient to justify invocation of the political question doctrine. At the very least, Plaintiffs have demonstrated that material issues of fact remain in this regard. Accordingly, Defendant's motion to dismiss

on this basis is denied.

### 2. Whether Fluor's Defenses Would Require The Court to Question The Propriety of Sensitive Military Judgments

Defendant asserts that adjudication of Plaintiff's claims would require the Court to improperly evaluate sensitive military judgments because Fluor intends to raise "a defense based on the reasonableness of the military's decision to locate the potentially relevant project in this area and directing [sic] Fluor to carry out the projects in the manner specified in the ESS Contract and appended Task Orders." (ECF No. 70-1 at 20-21.) Additionally, Defendant argues that the comparative negligence defense it has raised against Plaintiffs will invoke a proportional-liability system, requiring the Court to evaluate the reasonableness of Spc. Menendez and Spc. Martinez wearing improper safety equipment (namely, hard hats used in construction, not combat helmets as required by applicable Army regulations), driving a putatively unserviceable ATV (apparently it was missing two of its six tires), and allegedly driving around safety barriers and warning tape in a known construction area ultimately running the ATV into a ditch. (*See id.* at 21-22.) Defendant likens these defenses to the situation in *Taylor*, where the Fourth Circuit held that KBR's contributory negligence defense triggered the sensitive military judgments factor because resolution of the defense would require the Court to decide whether the Marines' decision to install a wiring box as a backup power source at the tank ramp was reasonable, and whether military leadership's initial decision not to provide a backup generator was prudent. *See* 658 F.3d at 411-12.

In *Burn Pit*, the Fourth Circuit adopted the reasoning in *Harris* when it held that the contractor's causation defense did not require judicial evaluation of military decision making of a character or depth sufficient to invoke nonjusticiability under the second

*Taylor* factor. *See Burn Pit*, 744 F.3d at 340-41. In *Harris*, the Third Circuit stated that when analyzing whether a proposed defense implicates a nonjusticiable issue, "courts must first decide whether the defendant has presented sufficient evidence to permit a jury to conclude that he established the elements of the defense by a preponderance of the evidence." 724 F.3d at 469 (internal quotation marks and modifications omitted). "If there is sufficient evidence to support the defense, then the District Court must determine whether the defense actually presents a nonjusticiable issue." *Id.* Here, the Court finds that Fluor's asserted defenses implicate conduct that is only tangentially related to national defense interests, if at all, and the undersigned would not be required to question sensitive military judgments in order to resolve the defenses. *See Al Shimari*, 840 F.3d at 155 (finding that identification of claims that would require a court to actually question sensitive military judgments involves a "discriminating analysis" regarding the "specific conduct" at issue and the "source of any direction under which the acts took place"); *see also Taylor*, 658 F.3d at 411 (finding sensitive military judgments would be improperly evaluated because specific judgments, made by military leadership, set the conditions for the accident in question).

Assuming that Defendant can present evidence sufficient to establish by a preponderance of the evidence that military authorities directed the location of Fluor's excavation trench on the side of the road and at the precise spot where it was indeed located,[8] Defendant cannot show that this fact renders Plaintiffs' claims unreviewable. This is true for the simple reason that the choice to locate the excavation trench in a particular place, in itself, is far too attenuated from the material facts that will drive

---

[8] (*See* Mot. to Dismiss n.13, ECF No. 70-1 at 20 (concluding, from a synthesis of Diefendorf's and Sanchez's deposition testimony, that the location of Fluor's excavation pit was a "military decision" because another contractor was approved for a different project on the opposite side of the road).)

resolution of Plaintiffs' negligence claims. To put it another way, Fluor's alleged actions in failing to keep a safe work area, in violation of its duties under the Contract, cannot be rationally construed as the product of military expertise or judgment. There is *no evidence of record* to establish that any military authority directed the alleged removal of the metal plate that had been covering the excavation trench prior to the Accident, or the alleged removal/modification of barriers, warning signs, and other precautionary measures that would alert traffic to the impassability of the road on the date in question.

Moreover, Defendant's appeal to *Taylor* is inapposite. The reason the defense asserted by KBR in *Taylor* triggered a finding of nonjusticiability was that the plaintiff's contributory conduct, and "especially" the Mayor Cell's previous decision not to allocate a backup power source to the truck ramp, involved *judgment calls of a military nature* unsuited for judicial evaluation. *See Baker*, 369 U.S. at 217 (insulating, in factors three and four, such matters from judicial intrusion). The contributory conduct alleged by Defendant here *does not* involve decisions of a military nature, but discretely negligent actions that permit judicial scrutiny whether they occurred at a construction site on Bagram Airfield or Main Street, Greenville—e.g., failure to wear required personal protective equipment ("PPE") and failure to comply with clearly displayed warning tape and safety barriers. *Compare Burn Pit*, 744 F.3d at 340-41 (stating contractor's "causation defense does not require evaluation of the military's decision making unless . . . *the military caused the Servicemembers' injuries, at least in part*" (emphasis added)). At the very least, Plaintiff has shown that material issues of fact remain regarding the factual basis for these allegations of contributory negligence.[9] Therefore, the motion to

---

[9] For example, in his Commander's Report of Disciplinary or Administrative Action, Captain Arlin Hernandez, U.S. Army, explained the reason why he issued only written counseling to Spc. Menendez for

dismiss premised on this prong of the political question analysis is denied.

### B. Applicability of Preemption Under the Combatant Activities Exception of the Federal Tort Claims Act

The FTCA operates as a limited waiver of the United States' sovereign immunity from civil liability. *See* 28 U.S.C. § 2674. However, pursuant to the combatant activities exception, the United States retains its immunity from "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). "Relying on the Supreme Court's decision in *Boyle v. United Technologies Corp.*, multiple circuit courts have held that the federal interests inherent in the combatant activities exception conflict with, and consequently can preempt, tort suits against government contractors when those suits arise out of what those courts viewed as combatant activities." *Burn Pit*, 744 F.3d at 346 (citing *Harris*, 724 F.3d 458; *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009); *Koohi v. United States*, 976 F.2d

---

failure to wear proper protective equipment while driving the Gator and took no administrative action against him pertaining to the accident: "My decision . . . is due to the fact [sic] the accident was caused due to a negligent action of the Constructor [sic] Co. They did not close or marked [sic] the area in which an almost 5 feet deep dish [sic] was made in front of the RSOI / CRSP Yard entrance." (ECF No. 75-2 at 6.) Captain Hernandez further stated, "there was not flashing or warning lights placed in the area causing lack of visibility. It is very obvious nothing was blocking the entrance otherwise my Soldier would not take the decision of [sic] use it." (*Id.*) In his Military Police Report, Officer Neftali Lizarraga noted that Captain Hernandez was already present at the scene of the Accident when he arrived on behalf of the Provost Marshal's Office. (ECF No. 70-13 at 6.) Officer Lizarraga testified that the Gator had to have been driven "between a sawhorse barrier and the orange concrete barrier" in order to access the place where it entered the excavation ditch. (Lizarraga Dep. 36:9-14, ECF No. 70-12 at 37.) However, he also stated that there was "an opening" and the trench "wasn't restricted or blocked." (*Id.* 49:1-4.) Moreover, Mr. Diefendorf testified that there was "one entrance and one exit" to the RSOI yard where the Accident occurred, and the RSOI yard was "a large parking lot for 18-wheelers that would come in all hours of the day and night." (Diefendorf Dep. 21:15-22:4, ECF No. 70-4 at 22-23.) Finally, Spc. Mendendez testified that prior to the date of the Accident the trench "was always covered with steel plates and concrete barriers because that was the entrance and the exit and the trucks would exit on top of the steel plates." (Mendendez Dep. 70:11-14, ECF No. 70-11 at 72.) Given this evidence, while it may be true that Plaintiffs' injuries were aggravated by a failure to wear proper helmets, there is a genuine dispute of material fact regarding whether Spc. Menendez had to "drive around" or otherwise avoid barriers that were blocking the entrance. Therefore, a significant portion of Fluor's comparative negligence theory may be entirely unprovable at trial, which counsels against nonjusticiability under the second factor of *Taylor*. Furthermore, judicial assessment of an Army E-4's decision to wear the wrong PPE and/or drive around safety barriers hardly implicates national defense interests inextricably intertwined with discretionary military judgments.

1328, 1336 (9th Cir.1992)).

In *Burn Pit*, the Fourth Circuit explained and applied a three-step analysis, derived from *Boyle* and its progeny, to determine whether federal law preempted state law in the context of tort suits against military contractors. First, the *Burn Pit* court adopted the Third Circuit's formulation of "uniquely federal interests" underlying cases in which a litigant attempts to hold a government actor responsible for its combatant activities, namely: "'The purpose underlying § 2680(j) . . . is to foreclose state regulation of the military's battlefield conduct and decisions.'" 744 F.3d at 348 (quoting *Harris*, 724 F.3d at 480). Correspondingly, the Fourth Circuit noted that "no 'uniquely federal interest' warrants preemption when the federal government has little or no control over a contractor's conduct." *Id.* (citing *Boyle*, 487 U.S. 500, 509-10 (1988)). Second, the *Burn Pit* court broadly construed the potential for a "significant conflict between this federal interest and the operation of the state tort laws underlying" a plaintiff's claims, stating, "when state tort law touches the military's battlefield conduct and decisions, it inevitably conflicts with the combatant activity exception's goal of eliminating such regulation of the military during wartime." Stated differently, "'the federal government occupies the field when it comes to warfare, and its interest in combat is always precisely contrary to the imposition of a non-federal tort duty.'" *Id.* at 349 (quoting *Saleh*, 580 F.3d at 7) (internal quotation marks omitted). Third, the *Burn Pit* court adopted the D.C. Circuit's test to ensure preemption is invoked when state tort laws conflict with the interest underlying the combatant activities exception, namely: "'During wartime, where a private service contractor is *integrated into combatant activities over which the military retains command authority*, a tort claim arising out of the contractor's engagement in such

activities shall be preempted.'" *Id.* at 349-51 (quoting *Saleh*, 580 F.3d at 9) (emphasis added). The military "need not maintain exclusive operational control over the contractor" for preemption to apply; rather, the government's interest in immunizing a military operation from suit is present when "the military retained command authority," even if the contractor exerted "*some* limited influence over an operation." *Id.* at 349 (citing *Saleh*, 580 F.3d at 8-9) (emphasis in original, quotation remarks and modifications omitted).

Applying this analysis to the facts of the case, the *Burn Pit* court held that performing waste management and water treatment functions to aid military personnel in a combat area constituted KBR "engag[ing] in combatant activities." *Id.* at 351. However, the Fourth Circuit determined that the district court had erred by concluding, before discovery took place, that "the military retained command authority" over KBR's waste management and water treatment activities. *Id.* In vacating the preemption ruling, the court stated, "At this stage in the litigation, although it is evident that the military controlled KBR to some degree, the extent to which KBR was integrated into the military chain of command is unclear." *Id.* (citing *Saleh*, 580 F.3d at 4 (identifying the proper focus as "the chain of command and the degree of integration that, in fact, existed between the military and [the] contractors' employees rather than the contract terms")) (internal citation omitted).

These precedents counsel away from the application of preemption under the combatant activities exception in the matter *sub judice*. There is little doubt that Fluor's installation and maintenance of electrical systems at Bagram Airfield qualifies as engaging in combatant activities. *See Burn Pit*, 744 F.3d at 350 (citing, approvingly, the

*Harris* court's determination that "maintaining electrical systems on a military base in a warzone qualified as a combatant activity"). However, the evidence presented in support of preemption is insufficient to establish that Fluor was integrated into the Army Corps' chain of command to a degree such that "the military retained command authority" over the safety requirements and responsibilities itemized in the ESS Contract. (*See supra*, sections A.1. & A.2.) Specifically, the Contract set forth duties on the part of Fluor to "follow work procedures in accordance with approved Safety Plan, which protect both contractor employees and U.S. soldiers in proximity to the job site" and to "establish a safety zone around the work area and establish a safety system with warning markers and other devices to prevent injuries to pedestrians and others who may be on or near the site." (*See* Task Order No. 8, ECF No. 70-2 at 47.) Moreover, though Plaintiffs' claims challenge Fluor's exercise of due care on the date of the Accident, it is undisputed that Fluor generally fulfilled its contractual duties through the actions and direction of its own management personnel. Mr. Diefendorf's general oversight of Fluor's project and periodic compliance inspections do not constitute integration into the chain of command of the type sufficient to warrant preemption under the *Burn Pit/Saleh* test. Accordingly, Plaintiffs' claims are not preempted by the combatant activities exception and the motion to dismiss for failure to state a claim premised on the preemption theory is denied.

### C. Applicability of Derivative Sovereign Immunity Under the Discretionary Function Exception to the Federal Tort Claims Act

The discretionary function exception to the FTCA excludes from the United States' waiver of sovereign immunity "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the

part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). A function is discretionary if it "involves an element of judgment or choice." *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988). The FTCA, by way of its definition of "federal agency" and "employee of the Government," excludes independent contractors from its scope. *See* 28 U.S.C. § 2671. However, the concept of "derivative sovereign immunity" comes from the U.S. Supreme Court's decision in *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), where the Court considered whether a private contractor could be held liable for damage resulting from a construction project authorized by Congress. In *Yearsley*, the Court recognized that a government contractor may not be subject to suit if: "(1) the government authorized the contractor's actions and (2) the government 'validly conferred' that authorization, meaning it acted within its constitutional power." *Burn Pit*, 744 F.3d at 342 (citing *Yearsley*, 309 U.S. at 20-21).

In *Burn Pit*, the Fourth Circuit applied the *Yearsley* rule to the question of "whether the government authorized KBR's actions in [the] case." *Id.* at 344. That inquiry involved "determining whether KBR 'exceeded its authority under its valid contract,'" also characterized as "exceeding 'the scope of its employment.'" *Id.* (quoting *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000)) (internal modifications omitted). The Servicemembers argued that KBR's authority should be construed narrowly, and that KBR exceeded its authority under the circumstances because it violated specific terms of the relevant contract and other government directives. *Id.* KBR argued that the court should take a broader view of the contractor's authority and find that KBR acted within the scope of its authority by performing general waste

management and water treatment functions. *Id.* at 344-45. The *Burn Pit* court found that *Yearsley* supported the Servicemembers' view—i.e., a narrow construal of the contractor's authority under directives from the Government. *Id.* at 345. The Fourth Circuit stated that language in *Yearsley* "suggests that the contractor must adhere to the government's instructions to enjoy derivative sovereign immunity; staying within the thematic umbrella of the work that the government authorized is not enough to render the contractor's activities 'the act[s] of the government.'" *Id.* (citing *Yearsley*, 309 U.S. at 20). Ultimately, the *Burn Pit* court determined that the record did not contain enough evidence to determine whether KBR acted in conformity with the contract, appended task orders, and any laws and regulations that the contract incorporated. *Id.* Therefore, the Fourth Circuit vacated the district court's decision to dismiss the plaintiffs' claims on grounds of derivative sovereign immunity. *Id.*

The parties in the instant case make arguments similar to those advanced by the parties in *Burn Pit*. Defendant generally asserts that Fluor followed the terms of the ESS Contract and Task Orders, along with direction received from the Army Corps in relation to its work at Bagram, and utilized permissible discretion in carrying out these directives—i.e., Defendant encourages the Court to adopt a broad view of its validly granted authority. (*See* ECF No. 70-1 at 28-29.) Plaintiffs, on the other hand, prompt the Court to take a narrow view of Fluor's authority, such that Fluor would only enjoy derivative sovereign immunity if it in fact adhered to the safety provisions in the Contract. They argue that by violating the specific terms pertaining to safe work procedures, establishment of a safety zone around the work area, and establishment of a safety system sufficient to prevent injuries to individuals near the worksite, Fluor

exceeded the scope of its authority under the Contract. (*See* ECF No. 84 at 29-30.)

After the *Burn Pit* decision, the Court must construe Fluor's authority narrowly. Plaintiffs have clearly alleged, and the available evidence clearly demonstrates, sufficient facts to state a plausible claim premised upon Fluor's failure to comply with its safety responsibilities under the Contract. Accordingly, the motion to dismiss is denied in so far as it asserts that Fluor is entitled to derivative sovereign immunity.

## CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss for lack of jurisdiction and for failure to state a claim upon which relief can be granted (No. 6:16-cv-00603-BHH, ECF No. 50; No. 6:14-cv-04902-BHH, ECF No. 70) is DENIED. The Court retains subject matter jurisdiction over these claims and Plaintiffs, in their complaints, have stated claims to relief that are plausible on their face.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

March 19, 2018
Greenville, South Carolina